**Dated: November 3, 2023**

**The following is ORDERED:**



Janice D. Loyd
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:                                      )
                                            )
MICHAEL LEE WALTERS and                     )          Case No. 23-10335-JDL
CHARLOTTE LEEANN WALTERS,                   )          Chapter 13
                                            )
                        Debtors.            )

**MEMORANDUM OPINION AND SUPPLEMENTAL ORDER**

**I. Introduction**

After a hearing conducted on July 25, 2023, the Court approved in part the Debtors'

motion to sell their residence,[1] but the question remains as to how those sale proceeds are

to be distributed: all to the mortgage holder or divided between the mortgage holder and

the Debtors.  The determination of that issue rests on whether the real estate mortgage

executed by the Debtors is security not only for the debt represented by the Promissory

Note executed in conjunction with the Mortgage but also security for a series of eight

subsequent loans incurred by the Debtors under security agreements secured by personal

---

[1] *Order Granting In Part Amended Motion to Sell Real Property Free and Clear of Liens and Encumbrances* [Doc. 110].

property.  Put more succinctly, does the "dragnet" clause in the Mortgage secure all of the Debtors' obligations to the creditor regardless of when those obligations arose or the purpose for which such obligations were incurred.

Before the Court for consideration is the following: *Amended Motion to Sell Real Property Free and Clear of Liens and Encumbrances* [Doc. 25]; *Security State Bank's Objection to Debtors' Motion to Sell Real estate* [Doc. 32]; *Debtors' Reply to Security State Bank's Objection to Debtor's Motion to Sell Real Property* [Doc. 41]; *Security State Bank's Supplemental Brief Concerning Mortgage "Dragnet" Terms* [Doc 107]; *Debtor's Brief in Support of Motion to Sell Real Property Addressing Issue of "Future Advances" Clause and "Limitation On Cross-Collateralization" Clauses Contained in Security State Bank Mortgage and Notes* [Doc. 108]; and argument of counsel had before the Court on July 25, 2023. Pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052, the Court hereinbelow sets forth its Findings of Fact and Conclusions of Law upon which this Opinion and Supplemental Order is premised.

## II. Facts

1. On June 27, 2018, Debtors Michael Walters and Charlotte Walters ("Debtors") executed a Promissory Note in the principal amount of $170,190.04 in favor of Security State Bank of Oklahoma ("Bank") (Loan # 2006556).  The Promissory Note stated that the "purpose of this Loan is Construct Spec Home for Resale."  The Note indicated that the security for the same was a Mortgage upon the property located at 11810 S. Council Road, Cashion, OK 73016.

2. In order to secure the Note, the Debtors contemporaneously executed a

2

"Mortgage (With Future Advance Clause)" upon real estate described as follows:

> A tract of land in the Southwest Quarter of Section 20, Township 15 North, Range 4 West of the Indian Meridian, Logan County, Oklahoma, described as follows: Beginning at a point North 0°06'33" West a distance of 807.20 feet from the Southwest corner of said Southwest Quarter, Thence South 89°39'00" East a distance of 1079.28 feet; Thence North 0°06'33" West a distance of 184.15 feet; Thence North 89°39'00" West a distance of 102.57 feet; Thence North 0°06'33" West a distance of 78.42 feet; Thence North 89°40'25" West a distance of 973.45 feet; Thence South 0°06'33" East a distance of 262.19 feet to the point of beginning.
>
> AND
>
> A tract of land in the Southwest Quarter of Section 20, Township 15 North, Range 4 West of the Indian Meridian, Logan County, Oklahoma, described as follows: Beginning at a point South 89°39'00" East a distance of 269.82 feet from the Southwest corner of the said Southwest Quarter; Thence North 0°06'33" West a distance of 807.20; thence North 89°39'00" West a distance of 269.82 feet; Thence South 0°06'33" East a distance of 807.20 feet; Thence South 89°39'00" East a distance of 269.82 feet to the point of beginning.

(the "Property). The Property consists of approximately 11.3 acres outside the city limits with the Debtors' residence situated upon it.

3. In pertinent part, Paragraph 3 of the Mortgage provided as follows:

> **3. SECURED DEBTS AND FUTURE ADVANCES**. The term "Secured Debts" includes and this Security instrument will secure each of the following:
>
> **A. Specific Debts**. The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 2006556, dated June 27, 2018, from Mortgagor to Lender, with a loan amount of $170,190.04 and maturing on June 27, 2019.
>
> **B. Future Advances.** All future advances from Lender to Mortgagor under the Specific Debts executed by Mortgagor

in favor of Lender after this Security Instrument. ***

****

**C. All Debts**. *All present and future debts from Mortgagor to Lender, even if this Security instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.*** This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices.***

****

(Emphasis added).

4. In pertinent part, Paragraph 4 of the Mortgage provided as follows:

**4. LIMITATIONS ON CROSS-COLLATERALIZATION.** The cross-collateralization clause on any existing or future loan, but not including this loan, is void and ineffective as to this loan, including any extension or refinancing.***

5. At the time of the filing of the Debtors' bankruptcy on February 17, 2023, the outstanding balance due upon the Promissory Note and Mortgage was $211,427.08, comprised of a principal balance of $170,162.13 and accrued interest of $41,120.95.[2]

6. Subsequent to the execution of the Mortgage beginning in August 2018, the Debtors executed a series of eight (8) Promissory Notes and Security Agreements with the Bank as follows:

**a.** Promissory Note and Security Agreement (Agricultural-

---

[2] The loan balances due on the Mortgage Note and the eight (8) subsequent loans identified below were derived from exhibits produced by the Bank at the hearing held on July 25, 2023, and were effective as of the date of the filing of the Debtors' bankruptcy on February 17, 2023. The Bank in its *Objection to Debtors' Motion to Sell Real Estate* [Doc. 32] provided a table of the balances due on each of the loans as of April 28, 2023. While the variation between the balances due is not outcome determinative of the issue before the court, it may be relevant for a final accounting.

Single Advance) dated August 14, 2018, in the amount of $20,475 and which stated that "the purpose of this Loan is to purchase Farm Equipment." (Loan #2007590). In pertinent part, the Promissory Note and Security Agreement provided as follows:

**6. PURCHASE MONEY SECURITY INTEREST.** This loan creates a Purchase Money Security Interest to the extent you are making advances or giving value to me to acquire rights in or the use of collateral and I in fact use the value given for that purpose. Purchase Money Loan means any loan or advance used to acquire rights in or use of any Property. ***

****

**11. SECURITY AGREEMENT.**
        **A. Secured Debts.** This Security Agreement will secure the following debts (Secured Debts), together with all extensions, renewals, refinancings, modifications and replacements of these debts:

                **(1)** Sums Advanced under the terms of this Loan Agreement. All sums advanced and expenses incurred by you under the terms of this Loan Agreement.

                **(2)** All Debts. All present and future debts of all Borrowers owing to you, even if this Security Agreement is not specifically referenced, the future debts are also secured by other collateral, or if the future debt is unrelated to or of a different type than this debt. ***

                This Security Agreement will not secure any debt which is also secured by real property or for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. ***

****

        **B. Limitations on Cross-collateralization**. The Cross-collateralization clause on any existing or future loan, but not including this Loan, is void and ineffective as to this Loan, including any extension or refinancing.

5

As of the filing of the Debtors' bankruptcy, the balance due upon this loan was $24,444.28.

**b.** Promissory Note, Security Agreement And Truth-In-Lending Disclosures (Consumer-Closed End) dated September 14, 2018 in the amount of $16,133.71 which stated "the purpose of this Loan is to purchase a "travel trailer" described as Octane Super Lite, 2018, Model: 272. (Loan #2008030). While bearing different paragraph numbers, this document contained the same terms under the headings "Secured Debts" and "Limitations on Cross-Collateralization" as under the Promissory Note and Security Agreement dated August 14, 2018. As of the time of the filing of bankruptcy, the balance due on this loan was $20,269.71.

**c.** Promissory Note (Agricultural-Draw) dated September 21, 2018, in the amount of $50,205 stated that "the purpose of this Loan is for short-term working capital." (Loan #2008162). The "Security" for the loan was a security interest in collateral which had been previously given the Bank: 2014 Kubota Tractor, given on 8/14/2018; 2017 Ford Expedition given on 9/21/2018 and a 2018 Octane Super Lite Travel Trailer given on 9/14/2018. While bearing different paragraph numbers, the Promissory Note contained the same terms under the headings "Secured Debts" and "Limitations on Cross-Collateralization" contained in the previous loan documents with the Bank. As of the time of filing of the bankruptcy, the balance due upon this loan was $62,877.06.

**d.** Promissory Note (Agricultural-Single Advance) dated November 29, 2018 in the amount of $30,355 with the stated purpose being "for short-term working capital." (Loan #2009053). The "Security" for the loan was a security interest in collateral which had been previously given the Bank: 2014 Kubota Tractor, given on 8/14/2018; 2017 Ford Expedition given on 9/21/2018 and a 2018 Octane Super Lite Travel Trailer given on 9/14/2018. The Promissory Note contained the same "Limitations on Cross-Collateralization" contained in the previous loan documents with the Bank. As of the time of the filing of bankruptcy, the balance due on this loan was $30,021.27.

**e.** Promissory Note, Security Agreement And Truth-In-Lending Disclosures (Consumer-Closed End) dated December 18, 2018 in the amount of $22,728.86 with the purpose of the loan

being "PERSONAL EXPENSES." (Loan #2009372). The collateral for the loan was two 2013 Polaris, Model: R13 and a Polaris 2011, Model: RNGR. While bearing different paragraph numbers, the Promissory Note contained the same terms under the headings "Secured Debts" and "Limitations on Cross-Collateralization" contained in the previous loan documents with the Bank. As of the time of the filing of the bankruptcy, the balance due on this loan was $29,150.25.

**f.** Promissory Note, Security Agreement And Truth-In-Lending Disclosures (Consumer-Closed End) dated January 16, 2019, in the amount of $41,378.43 (Loan #2009779) for the purpose of to "purchase a motor vehicle," being a 2014 Ford Model F250 pickup truck. Paragraph 8(E) entitled "Purchase Money Security Interest" provided that "Payments will be applied first to the non-purchase money portion of the loan, if any, then to the purchase money portion in the order to which the purchase money Property was acquired." While bearing different paragraph numbers, the Promissory Note contained the same terms under the headings "Secured Debts" and "Limitations on Cross-Collateralization" contained in the previous loan documents with the Bank. As the time of the filing of the bankruptcy, the balance due on this loan was $52,960.22.

**g.** Promissory Note and Truth-In-Lending Disclosures (Consumer-Closed End) dated February 1, 2019, in the amount of $11,090 for the stated purpose of the "Loan is FOR PERSONAL EXPENSES." (Loan #2010109). While the Promissory Note does provide for the aforementioned "Limitations on Cross-Collateralization provision, it does not contain any language granting a security interest in any personal property to secure the indebtedness. As of the time of the filing of bankruptcy, the balance due upon this loan was $14,030.96.

**h.** Promissory Note, Security Agreement And Truth-In-Lending Disclosures (Consumer-Closed End) dated April 30, 2019, in the amount of $21,715 for the stated purpose "to cover overdraft checking account." (Loan #2011539). The document granted the Bank a security interest in a 2018 JAYC TV vehicle and a 2014 Ford truck. The document contained the same terms under the headings "Secured Debts" and "Limitations on Cross-Collateralization" contained in the previous loan documents with the Bank. As of the time of the filing of

7

bankruptcy, the balance due on this loan was $28,763.05.

7.    The Debtors' proposed Chapter 13 Plan seeks to sell a major portion of the Property, including the portion upon which the residence exists, to satisfy the balance due upon the Promissory Note executed in conjunction with the Mortgage, property taxes and closing costs and to use any excess proceeds for the Debtors to build a new residence upon the remaining portion of the Property.  Pursuant to 11 U.S.C. §§ 363 and 1303,[3] Debtors filed an *Amended Motion to Sell Real Property Free and Clear of Liens and Encumbrances*. [Doc. 25].  Pursuant to the proposed Plan, the Debtors obtained a contract to sell a portion of the Property, which includes their current residence, subject to Court approval.

8.    The Contract for the sale of the real estate which the Court has approved provides for a purchase price of $365,000. [Doc. 25-1]. After the payment of real estate taxes and closing costs, it appears that the proceeds remaining would be approximately $335,000.  The balance due the Bank on the Mortgage and Promissory Note only, is approximately $211,427.  The balance due the Bank on all indebtedness, including the Mortgage, Note and the eight (8) subsequent loans, is approximately $450,000.  Debtors propose that the sale proceeds be utilized to pay the Promissory Note which was executed contemporaneously with the Mortgage with the Debtors retaining the approximately remaining $100,000 in proceeds to build a new house upon that portion of the real estate not sold.

---

[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

### III. The Issue

The issue before the Court is whether; (1) as contended by the Bank, the "dragnet" or "future advances" clause in the Mortgage make the real property secured by the Mortgage also security for all of the eight subsequent loans made by the Bank to the Debtors or (2) as contended by the Debtors, the "Limitations on Cross-Collateralization" provisions contained in all eight subsequent Security Agreement loans precludes the Real Estate Mortgage from securing any debt other than that represented by the Promissory Note executed in conjunction with the Mortgage.

### IV. Discussion

State law determines the nature and extent of property rights in a bankruptcy proceeding. *Butner v. U.S.*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190 (10th Cir. 2002); *In re Baldwin*, 514 B.R. 646, 652 (Bankr. D. Utah 2014); *In re Graham,* 144 B.R. 80, 81 (Bankr. N.D. Ind. 1992) (state law determines whether or not a dragnet collateralization clause creates a valid lien). A "dragnet" clause (also known as an "anaconda" clause) is a "mortgage provision that purports to make the real estate security for other, usually unspecified debts that the mortgagor may already owe or may owe in the future to the mortgagee." *In re Ballarino,* 180 B.R. 343, 346 (D. Mass. 1995); *In re Cushing,* 230 B.R. 639, 641 (Bankr. D. Conn. 1999); *In re Presser*, 504 B.R. 452, 459 (Bankr. S.D. Ohio 2014) ("A dragnet clause is one which, on its face, purports to include within the coverage of the mortgage all indebtedness of the mortgage or to the mortgagee, in addition to the specific debt secured by the mortgage, whether incurred before or after execution of the mortgage."); *Black's Law Dictionary* 508 (11th Ed. 2019) (Westlaw) (A "cross-collateral clause"... "also termed

9

*dragnet clause*."). "Other names given by the courts include anaconda, conglomerate, other indebtedness, open end, blanket, or omnibus clauses." *In re Lemka,* 201 B.R. 765, 767 n. 2 (Bankr. E.D. Tenn. 1996) (*citing* Milton Roberts, Annotation: *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts*, 3 A.L.R. 4th 690, 694-95 n. 3 (1981); *See* Barclay Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, ¶ 10.01 [3] [B] (describing such causes as "dragnet, octopus, Anaconda, boa constrictor, Venus flytrap"). Such terms are applied because such clauses, by their broad and general terms, may "enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate...." *Cushing,* 230 B.R. at 640. "Accordingly, "[d]ragnet clauses are generally enforced, but because their apparent coverage is so broad, and because the mortgagor is often unaware of their presence or implications, the courts tend to construe them narrowly against the mortgagee.*" In re Walsh,* 447 B.R. 45,50 (Bankr. D. Mass. 2011) (*citing In re Ballarino*, 180 B.R. 343, 346 (D. Mass. 1995).

There is no question that the Mortgage in the present case contains a "dragnet" clause which is set forth in the "Facts" ¶ 6(a) above. As a broad and general statement, it is well-settled that dragnet or future advance clauses are valid and enforceable in Oklahoma. *First National Bank in Dallas v. Rozelle,* 493 F.2d 1196, 1201 (10th Cir.1974) (It is clear that "[a] mortgage to secure future advances with terms extending the security to other obligations is recognized as valid in Oklahoma."); *First National Bank & Trust v. Security Nat. Bank*, 676 P.2d 837, 840 (Okla.1984) (creditor may obligate the collateral to cover future advances or other value in the initial security agreement). The Tenth Circuit's decision in *Rozelle* recognizing the validity of a dragnet clause, and upon which the Bank

10

places primary reliance, is factually distinguishable from the facts presented here.

In *Rozelle*, the Court considered whether, under Oklahoma law, three notes executed by the defendant were secured by virtue of a dragnet clause in a previously executed mortgage. Unlike the Mortgage in the present case which was given to secure a personal loan to Debtors for the construction of their residence, the initial debt in *Rozelle* related to commercial operations on the defendant's leasehold property and the subsequent notes were for unrelated ranching operations. In reversing the District Court which had held that the subsequent notes were not secured by the mortgage, the Tenth Circuit held that the dragnet clause in the mortgage extended to the subsequent loans based on the "clear and broad" language of the clause; however, the court indicated that the surrounding circumstances and the relationship of the parties should be considered when construing the contract:

> We must agree that the surrounding circumstances and the relationship of the parties should be taken into consideration. We must place ourselves as nearly as possible in the position occupied by the parties when the instrument was executed and then read the provisions within the four corners of the agreement. The contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. And construing the contract in the light of the surrounding circumstances known to the parties at the time of its execution does not violate the parol evidence rule, even though the writing is not deemed ambiguous. However, we feel consideration may not be given to the statements of either party as to their subjective intent in making the written contract. Thus we should consider all the proof outlined above as to the surrounding circumstances—the evidence of Rozelle's operations and the transactions between the parties underlying the execution of the Hughes County mortgage, but not his statements merely of his own intent in giving the mortgage.
>
> ***
>
> We see nothing in the surrounding circumstances necessarily

> inconsistent with giving these terms their plain meaning and
> applying them so that the subsequent Pushmataha County
> loans to Rozelle are secured by the mortgage. [Citations
> omitted.].

*Rozelle*, 493 F.2d at 1200-1201. The Circuit thus held that where there were no "surrounding circumstances" or "the relationship of the parties" relating to the dragnet clause, no subjective evidence was admissible to overcome the "clear and broad" unambiguous language of the dragnet clause.[4]   Were  there not any language in the Security Agreements purporting to limit any cross collateral, the Court would be faced with a situation, like that in *Rozell*, where the dragnet clause was enforced *because there were no other agreements or understandings questioning the applicability of the clause*.  Here, however, there are certainly other agreements (the eight Security Agreements) affecting the scope of the enforceability of the otherwise express language of the Mortgage's dragnet clause.

In the present case, the "Limitation on Cross-collateralization" provisions in the eight Security Agreements executed subsequent to the Mortgage contradict the Mortgage dragnet clause. To restate the Facts above, all the Security Agreements provided as follows:

> **B. Limitations on Cross-collateralization**. The Cross-collateralization clause *on any existing* or future loan, but not

---

[4] The Bank also cites *RCB Bank v. Villas Development, LLC*, 2011 OK CIV APP 44, 256 P.3d 1045, in support of the validity of  dragnet clauses in Oklahoma. There, following *Rozelle,* the court in a commercial transaction held that there was no dispute as to the scope of the dragnet clause, and the Bank was entitled to enforce the same by entry of summary judgment as a matter of law. Here, the scope of the dragnet clause is disputed, and as noted in the above quoted language in *Rozelle*, the Court should consider the surrounding circumstances and relationship of the parties in determining if there is any question as to the scope and enforceability of the dragnet clause.

including this Loan, *is void and ineffective as to this Loan*, including any extension or refinancing. (Emphasis added).

The Court reads this as an agreement on the part of the parties that the debts incurred in the subsequent Security Agreements would not be secured (collateralized) by any property other than the property identified in the Security Agreement itself, i.e. the debt would not be secured by the real property described in the *existing* Mortgage loan. The Bank argues that the dragnet clause in the Mortgage makes the real estate collateral for the subsequent Security Agreements. Such an argument would require this Court to disregard the express limitations on cross-collateralization provisions in the Security Agreements which the Bank drafted.

The Bank argues that "[f]actually, there is no 'cross collateral' provision in the Mortgage or in any of the other loan documents." (Emphasis in original). [Supplemental Brief, Doc. 107, pg. 6]. The Bank's argument fails to recognize that "cross-collateral" provisions are also synonymously referred to as "dragnet, future-advance or all-indebtedness provisions." The Bank prefers to utilize the term "dragnet" rather than "cross-collateralization," perhaps to avoid the language of the "limitation on cross-collateralization" provisions of the Security Agreements. Yet, simply put, cross-collateralization provisions allow the creditor to use collateral on one loan to secure another debt. That is what the Bank has done here under the use of the future-advances (dragnet) provision in the Mortgage it seeks to have the real property also stand as collateral for all eight future loans made to the Debtors.

Neither the dragnet clause or the limitations on cross-collateralization provision,

13

collectively or separately, is ambiguous.[5]  The language of the dragnet clause and the limitations on cross-collateralization provision in the Security Agreements are free of ambiguity so that the Court is to interpret each as a matter of law. *Lewis v. Sac & Fox Tribe of Oklahoma Housing Authority*, 896 P.2d 503, 514 (Okla. 1994); *MidCon Data Services, LLC v. Ovintiv USA, Inc.,* 2023 WL 1827860 (W.D. Okla. 2023).  In the Court's view, there is no way to reconcile those provisions.  They are contradictory and cannot stand together.

The Court finds that the express language of the limitation on cross-collateralization provisions in the Security Agreements override the dragnet clause contained in the Mortgage.  In reaching that conclusion, the Court is guided by the fact that the Security Agreements were executed *after* the Mortgage and dealt with specific debts to be excluded from the generalized, all-encompassing scope of  any future debts sought to be subject to the dragnet clause. *See Thornton Drilling Co., v. National Union Fire Ins. Co.*, 537 F.3d 943, 947 (8th Cir. 2008) ("A subsequent contract completely covering the same subject matter... but containing terms inconsistent with the former contract, so that the two cannot stand together... becomes the only agreement of the parties on the subject.") (quoting *Cooperative Refining Association v. Consumers Public Power Dist.*, 190 F.2d 852, 856 (8th Cir. 1951); *Saturn Capital Corp. v. Dorsey,* 2006 WL 1767602 *4 (Tex. Ct. App. 2006) ("... when the second contract does not state whether or to what extent it supersedes the parties' first contract, and when some provision of the two contracts conflicts, the conflicting

---

[5] "A contract is ambiguous when and only when it is reasonably and fairly susceptible of different constructions or meanings." *Cinocca v. Baxter Laboratories, Inc.,* 400 F.Supp. 527, 532 (E.D. Okla. 1975). The language in the dragnet clause of the Mortgage and in the limitations on cross-collateralization in the Security Agreements is clear and unambiguous on its face. "A contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of the terms." *Gonzalez v. Denning,* 394 F.3d 388, 392 (5th Cir. 2004).

provision of the later contract prevails.").  The Court is also guided by the principles of narrow construction given dragnet clauses, and that their coverage of future debts should be carefully scrutinized and "any doubt or uncertainty as to the obligation secured operates against the mortgagee." *Rozell*, 493 F.2d at 1201; *First National Bank v. Gillam,* 134 Okla. 237, 273 P. 261, 265; *Ballarino,* 180 B.R. at 346.

### Conclusion

For the reasons set forth above, the Court finds that the "limitation of cross-collateralization" provisions in the eight Security Agreements which provides that there is no collateral for such Security Agreements other than the collateral described therein negates the "dragnet" (or future advances) clause in the Mortgage to make the real property collateral for the debts evidenced by the eight subsequent Security Agreements. Accordingly,

**IT IS ORDERED** that upon the sale of the Property described in the Debtors' *Amended Motion to Sell Real Property Free and Clear of Liens and Encumbrances* [Doc. 25] the proceeds thereof shall be distributed in accordance with the Court's *Order Granting in Part Amended Motion to Sell Real Property Free and Clear of Liens and Encumbrances* [Doc. 110], except that from the proceeds remaining in the possession of the Chapter 13 Trustee he shall distribute to Security State Bank the balance due upon its Promissory Note No. 2006556 which, as of the date of the filing of Debtor's bankruptcy on February 17, 2023, had a balance due, including interest, of $211,427.08, together with interest accruing from the date of bankruptcy to the date of the Trustee's distribution of the

proceeds to Security State Bank.[6]  The balance of proceeds remaining, which the Debtors had estimated at $100,000 shall be distributed to the Debtors for the stated purpose of building a new home on the remaining property.

# # #

---

[6] Because of the Court's determination that the dragnet clause of the Mortgage does not cover the subsequent debts represented by the Security Agreements, the Court need not reach the arguments made by Debtors that the Bank waived any right to rely upon the dragnet clause or that the Bank failed to include a description of the real property in the Security Agreements required by the Uniform Commercial Code (UCC).  The UCC has no application to the creation or perfection of interests of real estate.